**HALLMARK CARDS, INC., Plaintiff,**

v.

**HALLMARK DODGE, INC., Defendant.**

No. 83–1377–CV–W–8.

United States District Court,
W.D. Missouri, W.D.

April 10, 1986.

Barry M. Katz and Theresa Hupp, Kansas City, Mo., for plaintiff.

Louis S. Wexler, Overland Park, Kan., Mark W. Slatkin, Kansas City, Mo., for defendant.

## MEMORANDUM OPINION AND ORDER

STEVENS, District Judge.

Plaintiff Hallmark Cards, Inc. (hereinafter Hallmark Cards) filed a three-count complaint against the defendant Hallmark Dodge, Inc. (hereinafter Hallmark Dodge) in late 1983, alleging that defendant has infringed its federally registered trademark in violation of section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); has engaged in unfair competition (false designation of origin) in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and has diluted the distinctiveness of plaintiff's trademark in violation of the Missouri anti-dilution statute, section 417.061 of the Revised Statutes of Missouri. The case was tried to the court sitting without a jury on March 17, 18, and 19, 1986.

### Findings of Fact
#### Plaintiff Hallmark Cards

Plaintiff Hallmark Cards is a Kansas City-based manufacturer of "social expression products." The company was established in Kansas City in 1910 by a young man, J.C. Hall, who kept his entire inventory of imported picture postcards in shoeboxes in his room at the YMCA. The name "Hallmark" was first used in the early 1920s and the "Hallmark" trademark was first federally registered in 1940. The following is a copy of Hallmark Cards' logo:

The company has flourished since its humble beginnings and now holds at least twenty-five federal trademark and service mark registrations which include the name "Hallmark" either alone or in combination with other words or symbols. Most of these trademark registrations have achieved incontestable status. In the 1940s Hallmark Cards adopted the slogan "When you Care Enough to Send the Very Best." Hallmark Cards now owns a federal service mark registration covering this slogan.

The current product line of Hallmark Cards includes greeting cards, calendars,

candles, Christmas ornaments, gift items, gift wrap, home decorating items, jewelry, puzzles, photo albums, mugs, party supplies, writing instruments, photo frames, plaques, plush toys, posters, ribbons and yarns, stickers, and stationery. Hallmark Cards currently sells at wholesale over $1 billion of Hallmark brand products per year; over the past twenty-five years Hallmark Cards has sold almost $10 billion worth of its Hallmark brand products.

Hallmark Cards markets its products primarily through a national network of independently owned retailers. These retail stores include specialty stores, and Hallmark concessions in drug and department stores. The target market for Hallmark Cards' social expression products is all adult members of the population although an emphasis is placed on targeting adult women, who are responsible for eighty-five percent of all greeting card purchases.

Hallmark Cards, which is a privately held company, has expanded and diversified in recent years to gain controlling interest in various subsidiaries. Hallmark Cards owns Crown Center Redevelopment Corporation, the owner of a complex of buildings in Kansas City, Missouri, containing offices, apartments, hotels, and a shopping mall; Halls Merchandising, Inc., the operator of three Kansas City area department stores; Trifari jewelry company; Charles D. Burnes Co., Inc., a manufacturer of picture frames; and Binney & Smith, Inc., the manufacturer of Crayola crayons and related art products. Additionally, Hallmark Cards owns a thirty percent interest in SFN Holding Company, a publisher of educational materials.

Hallmark Cards engages in an extensive, high quality, national advertising program that began in the 1920s. The first Hallmark Cards advertising utilized the print media. Radio advertising was added in the 1940s and 1950s. Television advertising began in the 1950s with the Hallmark Hall of Fame productions. Today Hallmark Cards employs radio, television, and print advertising in national magazines including Readers Digest, Ladies Home Journal, Better Homes & Gardens, and other "women's" magazines.

A significant portion of Hallmark Cards' $20 million a year advertising budget is utilized in the production of the Hallmark Hall of Fame series of television programs. There have been 148 broadcasts of this prime time, nationally televised program since 1950. Hallmark Cards is the exclusive sponsor and advertiser on these programs. A typical two-hour Hallmark Hall of Fame production will include twelve minutes of Hallmark advertising.

Hallmark Cards has also, since 1978, engaged in television continuity advertising. Continuity advertising is the common way consumers see products advertised on television—a variety of one-minute "spots" which diverse manufacturers purchase in order to air commercials for their products. Hallmark Cards also uses several types of point-of-sale advertising, including shopping bags, pocket calendars, and datebooks.

While Hallmark Cards attempts primarily to promote its product line through national advertising channels, the presence of the corporate headquarters of the company in Kansas City creates a strong, local awareness of the company and its products. Hallmark Cards is one of the largest employers in the Kansas City area and also operates facilities in the nearby cities of Liberty, Missouri; and Lawrence, Leavenworth, Topeka, and Osage City, Kansas.

Adding to the local awareness of Hallmark Cards is the company's commitment to philanthropic and charitable endeavors in the Kansas City metropolitan area. The Hall Family Foundation and its predecessor, the Hallmark Educational Foundation, have donated over $44 million to Kansas City area causes in the past forty years. The Foundation's charitable efforts are typically followed with media recognition for the company. Hallmark Cards has donated an additional $35 million in cash and merchandise gifts to philanthropic endeavors, seventy-five percent of which is given to causes in the Kansas City area.

As evidence of its strong reputation and name recognition in the Kansas City area, Hallmark Cards introduced the testimony of David Bywaters, who is president of Lawrence-Leiter and Company, a general management consulting firm that often conducts surveys for corporations. That company conducted a name and slogan identification survey,[1] supervised by Mr. Bywaters, in which randomly selected adult citizens of the Kansas City metropolitan area were telephoned and asked what they thought of when they heard the name Hallmark.[2] Over eighty-eight percent of those questioned responded with "Hallmark Cards," greeting cards, cards, or with something directly associated with Hallmark Cards.[3] Three persons, or one-half of one percent, responded "Hallmark Dodge." No other company was mentioned. Furthermore, when subsequently asked to repeat the slogan for Hallmark Cards, over thirty-three percent of those polled were able to quote Hallmark Cards' nine-word slogan verbatim or nearly verbatim. An additional 10.2 percent were able to recite some portion of the lengthy slogan.

The court is persuaded that this well-conducted and competent survey established that, in the Kansas City metropolitan area, there is overwhelming identification of "hallmark" with the firm Hallmark Cards. Furthermore, there is also a strong association or awareness in the public mind between the "caring" slogan and Hallmark Cards.

*Defendant Hallmark Dodge*

Defendant Hallmark Dodge is a Delaware Corporation with its principal place of business in Overland Park, Kansas. Overland Park is a Kansas suburb of the Kansas City metropolitan area. Hallmark Dodge is the present owner of an automobile dealership located at Interstate 435 and Metcalf Avenue in Overland Park, approximately three miles from the Missouri-Kansas state line, selling automobiles and trucks to residents of both Missouri and Kansas. Approximately thirty-five percent of Hallmark Dodge's annual sales are to Missouri residents.

From 1975 through early 1981, the auto dealership located at I-435 and Metcalf was operating under the name "Overland Park Dodge." While operating under that name, the dealership had frequent turnover in ownership and developed a reputation in the community for poor service, bad sales practices, and unstable ownership. The dealership was vacated in early 1981.

John Wallace is the president of Hallmark Dodge. In the fall of 1981, Wallace was in retirement in Florida after selling two Michigan Chrysler dealerships he had operated. He wanted to get back in the car business and looked at the vacant Overland Park Dodge dealership.

Wallace began negotiations with Chrysler regarding the acquisition of the dealership. When confirmation appeared imminent in August 1981, Wallace relocated to Kansas City. Negotiations were completed and Wallace assumed the presidency of Overland Park Dodge in November 1981. The dealership was incorporated in Delaware under the name Overland Park Dodge shortly thereafter. Wallace, along with Chrysler employees Jack Childs and Robert Banvard, was named as a director of the corporation. At that time, all of the voting

---

1. A summary of the survey results, in booklet form, was admitted into evidence as plaintiff's exhibit 76.

2. The exact question asked over the telephone was: "What do you think of when you hear the name Hallmark?"

3. Those answers deemed by the survey firm to be "associated with" Hallmark Cards included: "Crown Center," "gift wrap, cards, stationery," recitations of the Hallmark Cards' slogan, and other clear indications of Hallmark Cards.

Even some of the answers "considered not associated with Hallmark Cards" and therefore not included in the eighty-eight percent had some indirect relation to the company or were responses that indicated the respondent may have Hallmark Cards in mind. ("I shop there," "The store," "Store, of course") This is further substantiated by the fact that the same respondents knew the slogan. This leads the court to believe the survey result—eighty-eight percent— is a conservative estimate of the name association of "hallmark" with Hallmark Cards.

stock of Overland Park Dodge was owned by Chrysler Corporation.

Shortly after assuming the presidency of Overland Park Dodge, Wallace began making arrangements to reopen the dealership. In conversations with suppliers, Chrysler corporate employees in Kansas City, and prospective employees of the dealership, Wallace learned the extent of the poor reputation of the dealership and the negative connotations of the name Overland Park Dodge. Wallace determined that the name had to be changed to one that would convey quality and stability to the people of the Kansas City metropolitan community.

During November and December of 1981 Wallace had conversations and correspondence with Chrysler corporate employees in the Kansas City office regarding his name change proposal. Several names were considered. They included: John Wallace Dodge, Arrowhead Dodge, Century Dodge, Prudential Dodge, Johnson County Dodge, Shawnee Mission Dodge and, obviously, Hallmark Dodge. Curiously, however, no defense witnesses, including Wallace, could recall when the name Hallmark Dodge was decided upon or who suggested it. The name Hallmark Dodge is not mentioned in any name change correspondence with Chrysler corporate employees, although most of the other names are mentioned.

At the time the name Hallmark Dodge was selected, John Wallace; Ray Skillington, who was Kansas City zone manager for Chrysler; Robert Laws, the assistant zone manager; and John Kramer, met to consider the decision to adopt a new name for the dealership. At that time Wallace knew that Hallmark Cards had substantial business interests and holdings in Kansas City. Wallace testified he had known of the Hallmark Cards company, its reputation, and its slogan since he was a child. Furthermore, there was evidence, and the court finds, that the name Hallmark Dodge was chosen specifically to capitalize on the benefits of Hallmark Cards' good reputa-

tion and name recognition in the Kansas City area. A former employee of Hallmark Dodge testified that he was told that the name was chosen because it was a very reputable name in the area.

The fact that Hallmark Cards' presence in Kansas City may present some trademark problem for the defendant was the subject of concern and discussion by Chrysler corporate employees both in Kansas City and Detroit. In fact, the Chrysler corporate legal staff asked Wallace to do some "research" on the use of the name Hallmark. In response, Wallace sent the legal staff a copy of a page of the Kansas City white pages telephone book wherein several businesses using the name Hallmark were listed. The three other companies in the area that use "hallmark" in their name are Hallmark Inns, Hallmark Pharmacy, and Hallmark Steam Carpet Cleaning. This apparently satisfied the legal staff at Chrysler because the name Hallmark Dodge was approved.

The word hallmark may be found in a standard dictionary. A typical complete definition of the noun hallmark reads as follows: 1a) "an official mark stamped on gold and silver articles in England to attest their purity," b) "a mark or device placed or stamped on an article of trade to indicate origin, purity, or genuineness," 2) "a distinguishing characteristic, trait or feature." Hallmark is also defined as a transitive verb meaning "to stamp with a hallmark." *See* Webster's New Collegiate Dictionary p. 517 (1977).

After the name Hallmark Dodge was cleared by the Chrysler corporate legal staff in Detroit, Wallace employed Richard Moore, a salesman of promotional items, to design a logo for the dealership to use in its advertising. Moore prepared several sample logos using different styles and sizes of type and presented them to Wallace. Out of the several presented, Wallace chose the following example as Hallmark Dodge's logo:

# Hallmark Dodge

In addition to selecting this particular script rendition of the Hallmark Dodge logo, Wallace adopted and began using the slogans "We Care," "Because We Care," and "We Care Enough" in its advertising and signs. Wallace's selection of these particular slogans, the court finds, was made with full knowledge of the fact that Hallmark Cards employed and widely advertised the slogan "When you Care Enough to Send the Very Best" in conjunction with its product advertising. Furthermore, the court finds that Hallmark Dodge intentionally combined the name "Hallmark," the script logo, and the slogan to evoke Hallmark Cards' name and reputation in the minds of its customers.

Hallmark Dodge engages in an extensive advertising program utilizing local newspapers, several different radio stations, and television stations, but relying primarily on newspaper and radio advertising in the Kansas City metropolitan area. Hallmark Dodge further promotes its products by using its name, logo, and slogan on various promotional items. These include: license plate frames, car decals, stickers, key chains, buttons, and automobile title/document covers. In the five years Hallmark Dodge has been in business it has greatly increased its advertising expenditures each year. In 1985, its advertising budget was $500,000, up from $30,000 in 1982.

In the first weeks Hallmark Dodge was open for business in February 1982, several salespersons informed Wallace that customers were coming into the dealership and inquiring about the relationship between Hallmark Dodge and Hallmark Cards. Shortly thereafter, at a meeting of his sales personnel, Wallace told his employees how to deal with such inquiries. They were instructed to tell curious customers who asked that there was no relation. Hallmark Cards' employees have also been subject to consumer queries as to the relationship between Hallmark Cards and Hallmark Dodge.

Hallmark Cards promptly learned of Hallmark Dodge's use of the word "Hallmark," the "caring" slogan, and the script logo. In a letter dated February 9, 1982, one of Hallmark Cards' legal counsel, Barry Katz, demanded that Hallmark Dodge cease the use of the name Hallmark and the slogan "We Care." Hallmark Dodge has continued that use and this suit is the result.

### Conclusions of Law

Hallmark Cards has alleged three counts in this action for injunctive relief. Counts I and II are based on federal law, the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and therefore, this court has jurisdiction over the subject matter of this action in accordance with 28 U.S.C. § 1338 and 15 U.S.C. §§ 1121, 1125(a). The court has pendent jurisdiction over Hallmark Cards' third count, which alleges a violation of Missouri state law, section 417.061 of the Revised Statutes of Missouri.

*Count I—Trademark Infringement and Count II—False Designation of Origin*

In Count I of its complaint, Hallmark Cards alleges that its trademark rights protected by section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), have been infringed by Hallmark Dodge's use of a confusingly similar mark. Section 32(1) provides that it is trademark infringement to:

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, *or to deceive.*

In Count II of its complaint, Hallmark Cards alleges that defendant engaged in unfair competition in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Section 43(a) prohibits as unfair competition the use in interstate commerce of any "false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same...."

For purposes of this case, the elements of plaintiff's two claims under the Lanham Act are substantially the same. Hallmark Cards must show that it owns a protectible trademark or tradename and that defendant Hallmark Dodge has used, in commerce, a similar mark that is likely to cause confusion as to the source of defendant's goods or the involvement or association of Hallmark Cards in Hallmark Dodge's business. *See Emerson Electric Co. v. Emerson Quiet Kool Corp.,* 577 F.Supp. 668, 676 (E.D.Mo.1983); *WSM, Inc. v. Hilton,* 545 F.Supp. 1212, 1218 (W.D.Mo.1982), *aff'd,* 724 F.2d 1320 (8th Cir.1984).

█ It is not contested that Hallmark Cards owns federally registered trademarks on the name Hallmark and the slogan "When you Care Enough to Send the Very Best." A United States Trademark Registration of a mark is prima facie evidence that the registrant owns a distinctive mark and can use it to the exclusion of others in connection with the goods and services specified. *See Emerson Electric Co.,* 577 F.Supp. at 676; *WSM, Inc. v. Hilton,* 545 F.Supp. at 1218. This prima facie evidence of Hallmark Cards exclusive right to use Hallmark may be rebutted by a showing by Hallmark Dodge that the word is "generic." *See WSM, Inc. v. Hilton,* 724 F.2d 1320, 1326 (8th Cir.1984). Hallmark Dodge attempted to show that the word hallmark is generic, and therefore, not amenable to the protection of the trademark laws.

█ It is well-settled in trademark law that "generic" words are in the public domain and available for all to use. *See Singer Mfg. Co. v. June Mfg. Co.,* 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118 (1896); *Team Central, Inc. v. Xerox Corp.,* 606 F.Supp. 1408, 1413 (D.Minn.1985) (word "team" is generic); *WSM, Inc. v. Hilton,* 545 F.Supp. at 1218–19 ("opry" is generic). However, "generic," when used in this sense, means a lack of the distinctiveness necessary for the name or mark to acquire federal trademark law protection.

It is important to note that the term "generic" refers only to would-be marks or names wherein the mark or name in some way describes the very product. Therefore, a generic term refers to a particular genus or class of which an individual article or service is but a member. *WSM, Inc. v. Hilton,* 724 F.2d 1320, 1325 (8th Cir. 1984). If Hallmark Cards had sought to acquire federal trademark protection for "Cards" or "Greeting Cards," this would clearly be held a "generic" name unable to be protected. In *WSM, Inc. v. Hilton,* the Eighth Circuit upheld Judge Wright's finding that the name "opry" was generic. In that case, the word "opry" was found to be generic for the very type of song and dance show that it was used to describe. That case is distinguishable from the one at hand in that the word hallmark, as found in the dictionary, does not in any way refer to the genus or class of which cards and social expression products are a member.

The mere fact that the word hallmark is in the dictionary does not indicate that the word is generic for greeting cards or for social expression products. Rather, the test is one of buyer understanding. Some very strong and distinctive trademarks are those which attach a "dictionary word" to an unrelated product. The plaintiff points out such examples as "Shell" for oil and gas, "Camel" for cigarettes, and "Arrow" for shirts. These terms are arbitrary in that they are found in the dictionary but do not describe or suggest the products to which they are related. The court concludes that "Hallmark" is not a generic word as used by plaintiff Hallmark Cards. Rather, the trademark "Hallmark Cards" would properly be classified as an "arbitrary" trademark or tradename. Such "arbitrary" marks are entitled to maximum legal protection and do not require proof of secondary meaning.

The defendant Hallmark Dodge does not dispute that its use of the name Hallmark Dodge has been "in interstate commerce." Thus, the second factor of plaintiff's required showing is clearly met.

Finally, Hallmark Cards must show that defendant's use of the name Hallmark Dodge is "likely to cause confusion." The confusion may be confusion as to product source, or confusion as to sponsorship or affiliation. *See WSM, Inc. v. Hilton,* 724 F.2d at 1329. This showing is the gravamen of plaintiff's suit, as it is in any action for trademark infringement or false designation of origin.

The determination of whether there is a likelihood of confusion requires the consideration of several factors. *See WSM, Inc. v. Hilton,* 724 F.2d 1320, 1329 (8th Cir.1984); *Squirtco v. Seven-Up Co.,* 628 F.2d 1086, 1091 (8th Cir.1980); *Polaroid Corp. v. Polarad Electronics,* 287 F.2d 492, 495 (2nd Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). These factors include the strength of plaintiff's trademark, the degree of similarity between Hallmark Cards' trademark and Hallmark Dodge's name and logo, the proximity of the products and the likelihood

that the prior user will bridge the gap between the now non-competing goods, the existence of actual confusion, the defendant's intent in adopting the name Hallmark Dodge, the relationship between the parties' channels of trade and methods of advertising, and the sophistication of the customers of the products. *See WSM, Inc. v. Hilton,* 724 F.2d at 1329; *Squirtco v. Seven-Up Co.,* 628 F.2d at 1091; *Polaroid Corp. v. Polarad Electronics,* 287 F.2d at 495.

As the court stated in the discussion of "Hallmark" as an arbitrary trademark and as evidenced by the survey results considered in the findings of fact, the trademark "Hallmark Cards" is a strong and distinctive one. The plaintiff's survey indicated that over eighty-eight percent of the adults in the Kansas City metropolitan area related the term hallmark directly to Hallmark Cards. Furthermore, a surprisingly large percentage of the adult population could recite some portion of Hallmark Cards' slogan. Strong marks are entitled to greater protection than weak marks. *See Squirtco v. Seven-Up Co.,* 628 F.2d at 1091.

Analysis of the second factor, the similarity of the two tradenames or marks, is based on an examination of the marks as a whole, including visual impression. *Id.* at 1091. Furthermore, the degree of similarity is judged by comparing the marks, not side-by-side, but as they appear in the marketplace. *See Vitek Systems, Inc. v. Abbott Laboratories,* 675 F.2d 190, 192 (8th Cir.1982) (citations omitted). It is not necessary for this court to find that the names and logos are exactly the same. Similarities weigh more heavily than differences. *See Vitek Systems v. Abbott Laboratories,* 675 F.2d at 192 (citation omitted). There may be infringement where the substantial and distinctive part of the trademark is copied or imitated. *See Emerson Electric Co.,* 577 F.Supp. at 677, *quoting Queen Mfg. Co. v. Isaac Ginsberg & Bros.,* 25 F.2d 284 (8th Cir.1928).

In comparing the Hallmark Cards' mark with the Hallmark Dodge logo there can be

little doubt that they are very similar. While there are differences that can be pointed out readily in a side-by-side comparison, on the whole, the name and logos are so similar as to be confusing or suggestive of some relationship between the firms. Both use a flowing script typestyle for the word "Hallmark." It is incredible to suggest that the typestyle used by defendant was arrived at without consideration of Hallmark Cards' logo and typestyle.

The similarity is exacerbated by defendant's use of the slogans "We Care," "We Care Enough," and "Because We Care." Each slogan is reminiscent of Hallmark Cards' registered slogan "When you Care Enough to Send the Very Best."

█ The parties' products are not similar. Defendant sells automobiles while plaintiff's primary goods are "social expression" products. Hallmark Cards does have an automobile fleet of 1500 cars that are sold after several years, however, the plaintiff is not in the business of selling automobiles. Plaintiff Hallmark Cards is, however, constantly expanding its line of products and acquiring subsidiary companies. The fact that plaintiff and defendant do not directly compete does not impede the plaintiff's infringement claims. Infringement may be found in the absence of direct competition. *See Squirtco*, 628 F.2d at 1091.

While evidence of actual confusion is not essential, it is positive proof of the existence of a substantial likelihood of confusion. *See Squirtco*, 628 F.2d at 1091. As indicated in the findings of fact *supra*, there was evidence of actual confusion on the part of both Hallmark Dodge's customers and Hallmark Cards' customers. Employees of both of the companies testified, and defendant's president John Wallace affirmed, that they had been asked by customers about the relationship between Hallmark Cards and Hallmark Dodge. Upon opening the dealership, Hallmark Dodge sales personnel were being asked by customers about the relationship between defendant and Hallmark Cards. Wallace testified that he informed his salespeople at

a meeting how to deal with the customer queries.

Furthermore, a survey conducted by Hallmark Dodge of its customers who had purchased an automobile revealed that even after buying a car from the defendant, some customers thought that Hallmark Dodge was related to Hallmark Cards. Employees of Hallmark Cards, most notably those from the legal staff, the advertising department, and the auto fleet, testified that they each had been asked on several occasions about the relationship between Hallmark Cards and Hallmark Dodge. While such testimony is hearsay and generally entitled to little weight, the court credits this testimony as honest and credible. It merely further supports that which defendant readily admits—the existence of actual confusion.

The intent of the alleged infringer, Hallmark Dodge, in deliberately adopting a name, logo, and slogans similar to Hallmark Cards' gives rise to an inference that confusion is likely to occur. *See Emerson Electric v. Emerson Quiet Kool Corp.*, 577 F.Supp. 668, 678 (E.D.Mo.1983). Like in *Emerson*, defendant herein actually knew of Hallmark Cards strong trademark, logo, and slogan, yet deliberately fashioned a similar name, logo, and slogan in order to benefit from any customer confusion. The court cannot fathom a clearer case of a defendant intentionally adopting a name, logo, slogan, and entire advertising campaign to ride the coattails of an existing reputable company. This factor weighs heavily against the defendant Hallmark Dodge.

The buyer sophistication factor does not persuade the court, as defendant contends, that there is a reduced likelihood of confusion. Defendant maintains that people will not be confused because they put more forethought and research into buying an automobile than a card or gift. Defendant's own survey, however, indicates a small degree of confusion even *after* the sale of the automobile. More importantly, the target market for both products is the same—adult members of the general population. It is not unreasonable to suspect

that even sophisticated customers assume that many companies expand into unrelated areas and acquire subsidiaries that deal in unrelated products. In this case, the customer sophistication factor is simply not that clearly in defendant's favor, especially when one considers Hallmark Cards' recent expansions into other businesses.

 Based on a consideration of the foregoing *Squirtco* factors, the court concludes that Hallmark Dodge is infringing plaintiff's trademark in violation of section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1). Additionally, defendant's use of the name Hallmark Dodge, the script logo, and the slogans "We Care," "Because We Care," and "We Care Enough" is unfair competition and constitutes false designation of origin in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

Hallmark Dodge's defense—that the existence of other Kansas City area businesses using the word "Hallmark" in their name precludes a finding of a strong distinctive trademark—fails to persuade this court. Other circuits that have considered the issue have ruled that third-party usage of a mark similar to the plaintiff's is relevant only when defendant can show that the third-parties' marks are actually used, well promoted or recognized by consumers. Defendant did not introduce any evidence that the plaintiff's trademark was weakened by any use other than defendant's. *See University of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1545 n. 27 (11th Cir.1985); *Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc.*, 687 F.2d 563, 568 (2nd Cir.1982); *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173–74 (2nd Cir.1976).

*The Missouri Anti-Dilution Statute Claim*

Count III of Hallmark Cards' complaint alleges a violation of the Missouri anti-dilution statute, section 417.061 of the Revised Statutes of Missouri. The anti-dilution statute provides:

1. Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under sections 417.005 to 417.066, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

As stated in the statute, section 417.061, to prevail on this count Hallmark Cards need not show either competition between itself and Hallmark Dodge or any customer confusion. *See WSM, Inc. v. Hilton*, 724 F.2d 1320, 1332 (8th Cir.1984). Rather, the gravamen of a dilution complaint is that

the continuing use of a mark similar to the plaintiff's will inexorably have an adverse effect upon the value of the plaintiff's mark, and that, if he is powerless to prevent such use, the plaintiff's mark will eventually be deprived of all distinctiveness.

*See* Callman, The Law of Unfair Competition, Trademarks and Monopolies § 21.11, p. 34.

To prevail on its dilution theory, therefore, Hallmark Cards must show that its mark or tradename was valid at common law, that its mark is distinctive, and that Hallmark Dodge's use of its name, logo, and slogan creates a likelihood of dilution of the distinctive quality of Hallmark Cards' mark. *See WSM, Inc. v. Hilton*, 724 F.2d 1320, 1332 (8th Cir.1984).

 Hallmark Dodge does not dispute that plaintiff's trademark is valid at common law, rather defendant attempted to argue that Hallmark Cards could not proceed under section 417.061 because its mark was no longer registered in Missouri. A simple reading of the statute, however, clearly indicates that registration in Missouri is not required. A plaintiff can proceed under section 417.061 if its mark is valid at common law. As indicated above, Hallmark Cards' trademark is both strong and distinctive, it has been in continual use and indicates the origin of goods from a particular source. Thus, Hallmark Cards' trademark is valid at common law. *See Bass Buster, Inc. v. Gapen Mfg.*, 420 F.Supp. 144, 156–57 (W.D.Mo.1976).

 The court also finds that defendant's use of the name Hallmark Dodge in

conjunction with the script logo and the "caring" slogans will dilute the distinctive quality of Hallmark Cards' mark. The fact that defendant uses the Dodge corporation logo and sometimes may use the name "John Wallace's Hallmark Dodge" in advertising does not adequately remedy the dilution of plaintiff's mark in light of the other similarities.

Furthermore, defendant Hallmark Dodge, unlike the other small area businesses using the name Hallmark in their titles that do not advertise in the print, radio, or television media, engages in extensive advertising that is contrary to the images Hallmark Cards intends to convey in its advertising and in its business dealings. Hallmark Cards' advertising is high quality, sensitive, and attempts to foster inter-personal relationships and caring. The defendant's advertising on the other hand, not unlike other car dealerships, is loud, unprofessional when compared with plaintiff's, and stresses low, low prices. In short, the images that the two companies wish to portray are very different.

In light of all these factors, the court finds that Hallmark Cards is entitled to injunctive relief on the state anti-dilution act claim.

*Remedies*

Under both section 34 of the Lanham Act, 15 U.S.C. § 1116, and section 417.061 of the Revised Statutes of Missouri, Hallmark Cards is entitled to an injunction against defendant's continued use of the term "Hallmark" as a trademark or tradename in connection with its automobile dealership. The Missouri statute does not condition the grant of an injunction upon compliance with equitable principles. Section 34 of the Lanham Act does condition the court's power to grant an injunction on compliance with the principles of equity.

According to the Supreme Court in *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959), "[t]he basis of injunctive relief in the federal courts has always been irreparable harm, and the inadequacy of legal remedies." There is no doubt that irreparable harm exists when Hallmark Dodge's use of a mark creates a likelihood of confusion among consumers. Furthermore, a legal remedy—such as mere monetary relief—would not completely remedy the harm suffered by Hallmark Cards.

Accordingly, the court orders Hallmark Dodge to cease the use of the "Hallmark" name in connection with the operation of its car dealership. Because it would be unjust to order defendant immediately to cease the use of its name, the court will grant defendant a phase-out period. Defendant must immediately cease the use of "Hallmark Dodge" in its print, radio, and television advertising. Defendant may, however, use the name "John Wallace's Hallmark Dodge," "Johnson County Hallmark Dodge," or some other reasonable accommodation of a new name and the old "Hallmark" name. Within six months of the date of this order, however, the defendant must completely cease the use of the term "Hallmark" in all of its operations.

Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), provides for an additional remedy in that plaintiff may recover defendant's profits, any damages sustained, and the costs of the action. Furthermore, attorney's fees are recoverable under section 35(a) but may be awarded only in the "exceptional cases." When a defendant intentionally and wilfully infringes the trademark of another such an exceptional case exists. *See Metric & Multistandard Components Corp. v. Metric's, Inc.,* 635 F.2d 710, 716 (8th Cir.1980). There is no doubt, considering the court's findings of willfulness and intent, that attorney's fees are properly recoverable by Hallmark Cards in this case. The court also awards costs to Hallmark Cards to be paid by defendant.

Plaintiff Hallmark Cards also seeks an accounting of defendant's profits derived from its use of the Hallmark tradename. Because the parties sell non-competing products, however, and because the court is satisfied that the injunction will satisfy the equities of this case, no accounting for profits will be awarded. *See Sweetarts v. Sunline, Inc.,* 436 F.2d 705, 712 (8th Cir. 1971).

In summary, it is

ORDERED that defendant Hallmark Dodge is enjoined from using the term "Hallmark" in conjunction with the operation of its automobile dealership. It is further

ORDERED that on October 10, 1986, following the six-month phase-out period described *supra*, the name Hallmark shall be completely dropped from all of defendant's advertising, signs, promotional items, and all aspects of its operations. It is further

ORDERED that Hallmark Dodge shall pay the costs and attorneys' fees incurred by Hallmark Cards in the prosecution of this lawsuit. It is further

ORDERED that Hallmark Cards shall file a verified request for attorney's fees within twenty days of the date of this order. Hallmark Dodge may file any response to the verified request within ten days after it is filed.